The District Court's 123-month sentence, which is triple the low end of the guideline range on the drug count, is procedurally and substantively unreasonable, whether understood as a departure or as a variance. I'm sorry to interrupt so early, but do you have a position on which this is a departure or a variance? I think that the government has conceded that the District Court didn't provide a written explanation as required for its departure, so I believe the real fight here is on whether the variance is procedurally unreasonable. I think that's how the court should analyze it, because I think the departure is so plainly defective. But do we know what the District Court even thought it was doing? Not really. The District Court purported to announce a departure sentence but didn't comply with any of those procedural requirements, and then announced an alternate variant sentence but didn't address any of the 3553A factors or how they applied in this case, did not address Mr. Nance's arguments in mitigation, for example, that he had a de-escalating criminal history, that most of his serious felony convictions had been when he was young, or that he was in fact a drug user who was at best a low-level drug dealer, and that the gun in this case was neither used nor brandished nor in other ways reached for. So we believe that if this court were to view the sentence as a variance, that it would need to vacate and remand the sentences procedurally unreasonable under this court's cases in Blue, Ross, Lynn, Carter, and others. And I think Blue is particularly instructive. Blue was actually a within-guideline sentence, unlike this case, which was a significant variance upward. And the District Court actually in that case gave a more fulsome explanation than the District Court did here. There, the District Court considered arguments on behalf of Blue with respect to his history and characteristics, noted his substantial criminal history category and the seriousness of the offense, and noted that he had an older sibling who had a history of engaging in similar criminal activity. The court also recognized his opiate addiction. And this court vacated and remanded, saying that because the District Court didn't explain how the 3553A factors or their principles shaped its sentencing decision, didn't show that Blue was immune to other means of deterrence, and didn't engage counsel in a discussion about the merits of his arguments, it simply heard them. All of those things happened here. And it's even more egregious because this was an outside-of-the-guidelines sentence. This court has held repeatedly in cases such as Moreland, Dalton, and Hampton, that the farther the sentencing court diverges from the advisory guidelines range, the more the reviewing court must carefully scrutinize the reasons offered by the District Court in support of its sentence. I understand your statement that the variance wasn't explained. I mean, this is one of the more thorough sentencing analyses that I've seen. This is someone who, while incarcerated from probably somewhere between 2004 and 2008, up to, and finally, 2014, as described in paragraph 19, who sustained 79 infractions. And this is someone who's going to listen to his probation officer. This is someone who can't comply with the terms of supervision time and time again, who can't follow the rules when incarcerated. This is the court making these observations throughout this hearing. And then, at the end, alludes to that. But you make it sound as if nothing was said. If I listed it, it would probably be two or three pages of comments that she made about why he was a dangerous person and deserved more than what the guidelines said. And I think this court's recent case in Providence is instructive on that point, Your Honor. The District Court here certainly did ask questions of counsel and made some comments. And made statements and made observations. That's correct. And explained it. And then alluded to those observations in shorthand when it did the variance. It says this is a dangerous person and that's just what I read about. He can't be supervised. He doesn't listen. He has 79 infractions. And that's repeated throughout the transcript. This transcript goes on and on. And I don't think that's any more, I think it's actually less than what the District Court did in Blue. And similar to what- Blue said nothing. We concluded that nothing was said. No explanation was given. It was just a sentence. I don't think that's correct, Your Honor. My reading of Blue is that the District Court had said, quote, it considered arguments on behalf of Blue with respect to history and characteristics. The court notes Blue's substantial criminal history category and the seriousness of the offense. The court notes that Blue, with respect to his history and characteristics, was influenced a great deal by an older sibling who had a history of engaging in similar criminal activities. In Blue, I thought that there were entire arguments in mitigation that the District Court had never engaged with at the hearing. And we did say in Blue that that kind of active engagement would be, you know, we could derive an explanation from that. And I just feel like the main- Tell me what I'm getting wrong. I feel like the main argument here at the sentencing hearing was about the criminal history. And the District Court really engaged on that, on the argument that there had been no violent recidivism. Once he was released in 2014, the District Court talked about, I think it was in 2017, the domestic abuse charges and on the effect of having a baby, on the behavior. The District Court even held a recess so that it could get information about whether the behavior had changed in prison since having the baby. I mean, it just, it seems like the District Court was pretty thoroughly engaged with this core argument. I don't think the District Court ever acknowledged Mr. Nance's arguments about his youth at the time of his most serious offenses, which I think is significant under this court's case. Yes, it is. That's exactly why she took the break, because that argument was made that the last violent was when he was 20 years old. And she then actually broke, she wanted to know what the recent conduct was, but she was clearly engaged on that issue, individualized examination of that argument. I think, Your Honor, she was addressing the infractions that Mr. Nance had while he was in the current custody situation. The argument was being made that he is reformed and he's doing better since he was 20. And she gave about four or five reasons why that was not so. I mean, first of all, he was incarcerated. And then in prison, he had 79 infractions. And then when he came out, he had what Judge Harris is referring to. The District Court referred repeatedly to the general dangerousness of Mr. Nance. And that's where I think the District Court erred in failing to address the fact that the most serious conduct, and it's no doubt that Mr. Nance's rehabilitation has been iterative and incremental at best, but his most serious conduct was when he was young. And that was something that his counsel addressed both in his sentencing memorandum and at the sentencing hearing. I also believe the District Court failed to address the fact that Mr. Nance had a drug addiction himself, and that this was a relatively low quantity of drugs that he possessed that he never reached for the gun or used it in any way during this offense. And he was already significantly punished within the guidelines for his prior criminal history. He, nearly everything was scored except for a few offenses that were committed when he was a teenager. And in fact, he received six criminal history points for conduct that occurred when he was 20. That's a charge that was made to the court on JA-81 and talked about the fact that he had reformed. He had a child. He had something to live for. And now he was a different man. This is what the court said. Right now, the son is the source of great tension, as discussed in paragraph 33. And your explanation of why he was charged with breaking and entering to terrorize or injure domestic criminal trespassing and habitual felon, you're saying that that was his effort to see his son? She's basically saying the son has actually provoked further violence. That was her response. Now, whether we agree with these things is another question. But there is no question the district judge was engaged, fully engaged. I'm saying engaged as much as I've seen on cases of this type. She gave it a lot of attention. She did show that confusion about departure versus variances, which was a little surprising. But the fact that you say there was no explanation given for the variances, it's just blatantly not shown. I don't think, Your Honor, that the district court adequately addressed the 3553A factors and how they affected her sentence and why a lower sentence would not have been sufficient but not greater than necessary to deter Mr. Nance, especially in light of Mr. Nance's explicit argument that he received a guideline sentence of seven years of incarceration to be followed by five years of supervised release, which would put him under the auspices of the federal courts for 12 years until he was 45 years old. And I think this court's case in Providence is instructive. It was just issued last week. Well, she actually went from a range, top range of 27 months to 63 months. She did. And that's the whole variance. And that's a significant variance. Well, it is, but he still is going to get the 60 months. It's about three years. It's three years, but it's three times the low end of the guideline on the drug sentence. Well, why are you going on the low end? I mean, this guy clearly is... Because the math is easier, frankly, but it is a significant variance, I believe, under this court's cases. This court has talked about doubling the guideline range or tripling the guideline range. And I would note that this court has recently reiterated how significant and how important procedural reasonableness is. In fact, in a recent case in Providence, neither party raised the issue of procedural unreasonableness. Both sides argued that the context of the questions made clear what the district court was doing. And the panel, nonetheless, vacated and remanded the sentence, saying that it couldn't understand sufficiently what the district court's reasons were. Because you know exactly what the district judge did here and why. What you don't know is whether the district judge was departing or varying.  And you know them in spades. And so this has not left you in the dark. And you've argued it. You argued it. I don't know if it's you personally, but it was argued. The same arguments you're making now were made to the district court, and the district court responded to every one of those. I don't think so, Your Honor. And I think that especially in a case... I just read you a couple. And I was just touching the tip of the iceberg because, look, it goes on for pages. I think the district court's questions were largely also focused on an arrest record, which is also problematic. Because these were charges that were proven at best by probable cause. At sentencing, the standard is not high, but it is certainly a preponderance of the evidence. And in this case, the government had every opportunity to present additional evidence related to past charges or conduct that was concerning to it. But it didn't take that opportunity. And so the district court's significant focus during the few questions that she asked were targeted toward these arrest records at paragraphs 33, 34, and 35 of the pre-sentence report. And all that they contain are the bare allegations. There was not an additional police report that was entered into evidence. There was no testimony that was received. And that's another concern to us, is that the district court was considering an improper factor. Are you actually arguing that the district court improperly considered the arrest record or not? I don't think we know that for sure because our argument is that we don't understand from the context of the hearing. It's not patently obvious in our view what the district court was relying on. But if the district court was, in fact, relying on the bare arrest record, which it appears to us is possible. But I said you're allowed to rely on arrests if the PSR gives further factual information. You are allowed to rely on the factual underpinnings, but our view is that when it's simply a charge and all that's stated in the PSR is the allegations, there's no additional evidence. The Fifth Circuit referred to this as indicia of reliability in the Harris case. We cited that in our opening brief, that the district court should have relied on something more than just the bare allegations in the pre-sentence report. Because at the stage of the pre-sentence report, all that the defendant would be contesting or objecting to would be the fact of the allegation. Even though he didn't object to that, there wasn't any further explanation about the context. And I think that's important because here, even in the allegation, the charge that you alluded to, I believe, Judge Harris, which was in February of 2017, they're certainly serious sounding charges, but there was no allegation of physical violence and nothing to indicate that a weapon was possessed or that there was any physical violence during this February 2017 incident in paragraph 33. The paragraph 32 event occurred prior to Mr. Nance's incarceration and so is still consistent with this argument that his behavior had de-escalated, even if he still had later criminal charges. And all three of them, 32, 33, and 34, were ultimately dismissed. Only one of which, I believe, referenced the indictment by the federal government. So there could certainly have been other concerns or other reasons why those charges were dismissed that were not explored. This is, we believe, a heartland case for someone with a criminal history category of five and where there is a more significant variance here, triple the low end of the guideline on the drug count, the district court is bound to give a more expansive set of reasons for its sentence. We don't believe the district court did so here and that this court should vacate and remand for resentencing on that basis. Thank you, counsel. Is it Ricky? Yes, sir. Thank you, Mr. Ricky. May it please the court, Evan Rickey on behalf of the United States. Your honors, we are here today asking that this court affirm the judgment and the sentence imposed by the district court. It is our position that the sentence was both procedurally and substantively reasonable. Can I ask you the same question I asked your colleague? Is this a departure or a variance? What did the district court intend to do here? Do we know? Based on the record, your honors, our position that this was an upward departure and an alternative variance. The only reason why I think there's any doubt is there was an error or appears to be an error in the statement of reasons where the boxes for upward departure and the reason for the upward departure were not ticked. But the box Actually, the judgment rests solely on a variance. That's correct, your honors. And it gives the reasons for the variance. That is correct, your honors. Okay, so there was no indication on the judgment that a departure was intended. During her speaking sentence, she said she was departing alternatively a variance. That's correct, your honors. So as your honor just said, on the judgment itself, there's no indication that it is an upward departure. However, when you look at what the district judge said, she talks about an upward departure. She goes through the incremental steps outlined in the Dalton decisions to reach the guideline level that she did. Your honors, I wanted to respond to this notion about whether or not it was improper for the district judge to consider the arrests that are outlined in paragraphs 33 and 34 of the pre-sentence report. These were arrests that did not lead to convictions. I think it's important to look at the transcript because the reason that the district judge was even talking about this is that she was responding to an argument that the defense counsel had been making. On page 77 of the joint appendix, 76 and 77, defense counsel is making an argument saying, I think it's notable after he's released, he doesn't have any more violent convictions. These are charges that may look violent, but they're of a completely different kind than he was engaged in when he was a teenager. And it shows that he's capable of controlling himself. And the colloquy goes on a little bit further. And in response, the court says, well, his assault of tendencies are documented in paragraph 34. And she's referring to one of the arrests that did not lead to a conviction. And at that point, defense counsel snaps back and says, oh, sorry, your honor, you can't consider arrests that didn't lead to convictions. But then the district court on page 78 of the joint appendix says, well, I think it needs to be talked about in the context of an argument that says he's able to control himself. So the only reason the court is even looking at this is because defense counsel is making an argument. And it seems that the district defense counsel provided additional explanation, factual explanation of a dispute they had had with his wife and in connection with visiting the son. That's absolutely correct, your honor. And so it seems as though here the district court is put in a position of, you know, damned if you do, damned if you don't. On the one hand, district judge is required to respond to the arguments, the non-frivolous arguments that are being made by defense counsel. And that's what she's doing. She's responding to the arguments, referring to the arrests. And certainly if this upward departure or alternative variance had been based solely upon these arrests without convictions, certainly that would have been improper. But that's not what happened here. The district judge was looking at the history and characteristics of this defendant. She was looking at the nature of the offenses. She was looking at the fact that this is a man who has four felony convictions and every single time that he's placed on probation or supervised release, he's violating the terms of probation or supervised release. She's looking at the fact that when he's incarcerated, 79 infractions. She talks about that. She takes the unusual step of taking a break in the proceedings to see how he's doing while awaiting sentencing on these very charges. So the district judge was fully engaged in the process, fully engaged in responding to many different arguments that were made in mitigation. And the fact that the district judge found these arguments to be non-persuasive does not mean that they were in any way, that her actions were in any way procedurally or substantively unreasonable. Can I ask you a question about your McCollum argument? So this is the argument that the criminal history score doesn't adequately represent the seriousness because under McCollum, he's not a career offender. Yes, Your Honor. So is the government's position that any time a PSR applies our case law under McCollum, it has underrepresented the criminal history score and the actual score ought to be what it would be had McCollum come out the other way? No, Your Honor. I don't think that would be the government's view. That's what you argued in this case, right? In this case, yes, Your Honor. In this instance... Do you see how that would strike, that it seems a little odd that a PSR, if it properly applies our case law in defining a career offender, has done it, has undercount, basically the right answer ought to be as though McCollum had come out the other way? I think certainly in this instance, that is the argument we were making. This court in the Lawrence decision has said that it's acceptable to look to sentence someone as a de facto career offender. I think that's what the government was arguing for at sensing, is for this person to be treated as a de facto career offender. And the reason is because McCollum was wrongly decided? That was the position taken. My question is, is that going to be the government's position in all cases involving the McCollum issue, that McCollum is wrong and people ought to be sentenced as though McCollum were decided the other way? I can't categorically say that the government will be saying that in every single instance. I think one of the... Why do you say it at all? It seems to me the question suggests that the law of the circuit is the law of the circuit. Law is the... And you shouldn't be advising district courts to violate the law of the circuit, should you? I don't think we're... Even if we were saying to the district court that he should be sentenced as a de facto career offender, I don't think that that would necessarily be asking the district court to violate the law or to... Except you said, in speaking to the court, you said you thought McCollum was wrongly decided. Now, that's an issue you could raise to us for reconsideration of it in bank or something, but it is an opinion that stands. And it's a little surprising that you're urging the district court, who has no authority to ignore it. I think, Your Honor, that was the argument that was being made, and we're not questioning the McCollum decision. What we are saying is that it was... That the recommendation was to sentence him as a de facto career offender. And this court, in the Lawrence decision and others, has said... Well, it might be advisable for you not to hesitate in response to the question and say we are not, as a matter of policy, urging the court not to follow precedent. And if you find a way around McCollum or you can distinguish it or some other basis, but it seems to me it's important to us to be sure the district courts follow our decisions and they can make... If we've done an error, and we make a lot of them, I'm sure, we try to redress them or the Supreme Court redresses them. And we're not questioning... I'm not questioning McCollum. I think what we did ask for, what the government asked for at sentencing, was that he be treated, that Mr. Nance be treated as a de facto career offender. And one of the reasons is that one of his prior convictions, as the court is aware, was a conspiracy to commit armed robbery. And the basis of McCollum is that conspiracies don't necessarily require an overt act. In this case, as made clear in the PSR, that conspiracy to commit armed robbery, Mr. Nance did, in fact, conduct overt acts. He fired into a vehicle. Well, that's fair enough. Then you can argue a de facto, but you can't argue that the conviction of conspiracy supports it. That's right. Because McCollum basically distinguished between the substantive act and conspiracy. That's correct, Your Honor. We did that recently in Sims. That's absolutely correct, Your Honor. So the argument is that he should have been treated as a de facto career offender. Because the conduct satisfied a substantive conviction. That's correct, Your Honor. In terms of conduct, but not in terms of conviction. And when you look at the government's recommendation, and then you look at what the court did, I think it further strengthens our contention here that the court crafted an individualized sentence, a thoughtful sentence, and the court itself said, I'm tempering, or this is a tempered Fortunately, the court didn't follow your recommendation, number one, and didn't follow your reasoning. The court did not, Your Honor. And so I think that goes to the fact that the court responded directly to a lot of the arguments that were being made. It considered the government's argument, and it rejected it. It considered many of the defense arguments and rejected those. And I wanted to take a moment. Before you get to that, I have a question. How did the court address the question about development of a frontal lobe not being fully developed? Well, Your Honor, the court talked about, and this is on page 87 of the Joint Appendix, the court said you had some serious things happen to you as a child that happened to you through no fault of your own. But now you're an adult, and you keep acting against society. You keep acting against norms, and you need mental health treatment. So the court, I think, did address the fact. That's an organic question. It's not a question about environment. She was talking about there's some unfortunate things in the environment. It's talking about an organic brain development. That's different. That's right, Your Honor. And therefore, it's sort of a universal aspect in its impact on a person's tender years in terms of brain development, not whether he was in a rich home or a poor home. Is it? That's correct, Your Honor. And I think the science is well-settled on this in terms of frontal lobe development, brain development, impulse control that younger people have versus people... And how was that addressed by the court? Well, I think what the court was looking at is that from age 16 to age 33, there's an unbroken record. There's sort of a chain of events of violating the law, violating norms, violating any kind of rules, continued involvement with narcotics, with firearms. And so I think the court was not persuaded because the court was looking at this unbroken chain of events from age 16 to age 33. And so I think the court was certainly acknowledged, you know, heard the argument, you know, didn't necessarily disagree with it, but the court is also looking at an unbroken type of conduct that is continuing. You mean because after age 20, he continues to have infractions? That's correct, Your Honor. But that's a self-fulfilling prophecy. I'm not talking about the judge. I think, you know, continuum studies show that persons who don't receive mercy during that period of time when the frontal lobe is not developed, it's very likely their life will spiral in terms of post-20s to have that. Does anybody ever tell you that if a kid who's 16 years old gets in trouble, one kid goes home and says, to parents, and says, don't do it again, but the other goes to detention, studies show it's very likely after they're in adult life, they'll continue to spiral toward that. The question is how you're dealt with during that time when the frontal lobe is not developed and how you're dealt with, like pipeline from school to prison, studies in terms of what used to be pushing at the water fountain and you had to stay back in school and write I will not do it 100 times now becomes call a police officer and you get a record. So how was that addressed, if at all? Your Honor, there's nothing in the record of the court specifically addressing that question. I didn't find it either. And Your Honor's raising... Well, let me ask you... Okay, you can finish answering my question, go ahead. But I think Your Honor's raising sort of a much larger sort of philosophical or societal type issue about what happened. It's not philosophical, it's quite existential, really. And it is something that I think perhaps the district court looking at this particular defendant in front of her was not able to really address or fix, because this is a much broader issue throughout our criminal justice system. It's certainly not fixed by tripling the time, is it? Well, maybe it is, maybe it is, though, I don't know. Well, Your Honor, I would just say that this was not Mr. Nance's first offense. He came to the court with a very long history and he did, with the initial convictions that are laid out on page 113 in the PSR, the initial conviction, possession of a motor vehicle, breaking and entering, he got suspended sentences, five to six months in custody suspended, followed by probation, but then the probation was revoked. He goes back again, another conviction, another suspended sentence on probation, probation gets revoked. So this, so by the time he came before the district court, there was a lengthy history of criminal violations, of second chances, of violations of probation, violation of terms of supervised release. So that's what the district court was looking at when Mr. Nance came before her for second chances. This is just the end of my other question. Yes. Well, I was just wondering a little bit why the court's suggestion that you need a mental health treatment and you had some serious things happen to you, though no fault of your own as a child, and you need somebody to be helping you with mental health treatment. Why that isn't a response, I mean, there's not much more, the court recognized it in the beginning of the sentencing and at the end of the sentencing. That's correct, Your Honor. And it's a serious problem, but it seems to me to the extent that can be addressed, wouldn't mental health treatment be the best thing that could be done? Of course it is. And in the context of federal prison, that is the best and that's the most that could be done for him. And I think that's what the court was, that's what the court, that's one of the reasons that the court ended up imposing or having that be one of the conditions of his incarceration is that he does, in fact, receive this mental health treatment. Thank you. Thank you, Your Honor. And so, Your Honor, my time is running short, but I just wanted to pivot to the, whether you look at this as an upward departure or you look at it as a variance, the sentence was reasonable. In terms of a variance, the court was focused very much on the history and characteristics of the defendant. It was concerned about deterrence, given his long history of violent conduct. And clearly the court was not persuaded by the argument that, well, it wasn't, the drugs weren't that many, he didn't use the gun. If you look at the conduct underlying counts, I believe, two, three, and four of the indictment that occurred on April 28th of 2017, this all started because the mother of Mr. Nance's son called the police and said, hey, he's sitting in my driveway, I'm afraid. The police came. He attempted to elude the police. You had one officer who had to jump in the vehicle while it was rolling forward and turn the car off. When they arrest him, they find a distribution, a quantity of heroin. They find him with a firearm. He himself is intoxicated or high. This is inherently dangerous conduct and the court was simply not persuaded by the argument by defense counsel that, well, there weren't that many drugs, he didn't use the gun, what are we supposed to do? Wait until he shoots someone? Wait until he runs over a police officer who's trying to stop him? So the court was looking at 35, 53 factors including his dangerousness, including his history and characteristics. This court has said repeatedly that the district judge does not need to robotically tick through each of the 35, 53A factors. I think we agree that Blue controls here based on the record. It's patently obvious to us as we look at the record, the bases upon which the court varied upward or if you say this is a departure, the bases upon which she departed upward, it's very obvious. In Blue, I believe the defendant in that case made about eight different arguments and the district judge only responded to one or two. Here the record is filled with detailed engagement and response by the district judge to the non-frivolous arguments being made and the fact that the district judge wasn't persuaded doesn't make this sentence substantively or procedurally unreasonable and we've asked the court to uphold the sentence. I have another minute left. I'm happy to answer any of the questions that the court may have. Thank you, Counsel. Thank you very much, Your Honor. Ms. DeLauro. Thank you, Your Honor. Chief Judge Gregory, I'd like to respond to your point about the frontal lobe development which I also believe was not addressed by the district court and it's particularly significant in this case where six of nine of Mr. Nance's criminal history points came from a time when he was 20 or younger. And so irrespective of what happened after that time, when you talk about increasing someone's advisory guideline range or increasing their ultimate sentence by triple, the low end, that is a suggestion that there is an inadequacy of the criminal history category and here's so much of that criminal history. No, if I read the record correctly, you made this argument below, but you made the argument when I say you again, your side made the argument, that a general statement, it says, neurological research, I'm sure the court is aware, indicates that the frontal lobe which is responsible for impulse control is not fully formed until 25. We had no specific evidence that that was the case here, but we accept the argument that he was 25. So that was part of your argument that he is now no longer violent because he's over 25. And then the argument goes on, look at his record afterward, he's committed no violent crime since he was 20. That was the argument made below. The court then addressed and went into everything we just discussed earlier in the oral argument today about visiting the child and the explanation for it and how they got into dispute and so on. And the current infractions or disregard in his detainment pending sentencing. So all of that was a response by the court to the fact that since he was 25, he has not turned the corner. The argument was he's not fully developed and he has a child and he's no longer violent. That basically was the substance of why he should be and I'm just suggesting it seems to me, and you can address it, but it seems to me the court spent a fair amount of time on that because I thought that was the main argument you had made below. I think, Your Honor, this court's decision in Howard is really instructive. Could you just address what the record shows? Sure. I think the record shows engagement on some level with his subsequent history, but I think it is a different question whether his prior offenses at ages 25 and younger should be viewed as severely. And that's what this court addressed in Howard. And vacated and remanded. I understand that. I understand that. The court noted that. That was in the record in the pre-sentence report, but your argument was that his later record showed improvement, therefore he shouldn't. And the court said, I don't see that improvement with 79 infractions. I don't see that improvement with respect to his conduct, charged conduct, when he went to visit the child. I don't see that with respect to his current detainment. And that's what the court's saying. Now, if the court's right or wrong is another question, but the court considered it. If I may respond, Your Honor. Yeah, please. There are, I think, two arguments there. And one is that this prior conduct is already baked into his guideline range in a significant respect. Well, I thought you were talking about it wasn't. The court didn't address it. That's right. The court did address it. The question if it addressed it in error is another argument you would like to make. But I understand that. I was just raising the question of whether the record doesn't show that the court not only considered it, but considered it at some length in responding. But I understand your position. May I respond briefly, Your Honor? Yeah, you may. And also, the point of Howard is it showed that when you don't adequately look at it, it's substantive unreasonableness. Not just procedural, but substantive. The 2014 case clearly does. Because it's a different question of whether or not he is better or better. The question is, how did you deal with that criminal record there and account for it? Instead, it was added up, added up, and then on top of what we say may be now. That's what Howard stands for. Absolutely. And I think even setting aside subsequent conduct, his old conduct is reaching into this sentence in a way that we believe was inappropriate. We'd ask the court to vacate and remand. Thank you. Thank you, Counsel. All right, we'll come down, greet Counsel, and proceed to our next hearing.
judges: Roger L. Gregory, Paul V. Niemeyer, Pamela A. Harris